IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NORTH AMERICAN DENTAL          )
MANAGEMENT, LLC,               )
                               )        No. 2:23-cv-01202
            Plaintiff,         )
                               )        *Electronically filed*
        v.                     )
                               )
MICHELE PHILLIPS,              )
                               )
            Defendant.         )
                               )

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.   FACTUAL BACKGROUND ................................................................ 2

  A.   About NADM ........................................................................ 2

  B.   Phillips' Employment with NADM and Access to NADM Confidential
       Information and Trade Secrets ............................................. 4

  C.   Phillips' Contractual Obligations to NADM ........................... 6

  D.   Phillips Resigns from NADM and Immediately Breaches her Legal
       Obligations to The Company .............................................. 8

  E.   Phillips Does Not Respond to NADM's Letters Regarding Phillips'
       Obligations to NADM .......................................................... 9

  F.   NADM Protects Its Confidential Information and Trade Secrets ....... 11

II.  THE COURT SHOULD GRANT A TRO AND PRELIMINARY INJUNCTION
     AGAINST PHILLIPS AND ENJOIN HER FROM WORKING FOR NADM'S
     DIRECT   COMPETITOR   AND   FROM   MISAPPROPRIATING   ITS
     CONFIDENTIAL INFORMATION AND TRADE SECRETS .................... 12

  A.   NADM Will Prevail on the Merits ......................................... 13

       1.   NADM Will Succeed on its Claims under the Defend Trade
            Secrets Act and Pennsylvania Uniform Trade Secrets Act ............ 13

       2.   NADM Will Succeed on Its Breach of Contract Claim Against
            Phillips .................................................................. 16

       3.   NADM Will Succeed on Its Unfair Competition Claim .................. 18

  B.   NADM Is Suffering and Will Continue to Suffer Immediate and
       Irreparable Harm Absent a TRO and Injunctive Relief ............. 19

  C.   The Balance of Equities Strongly Favors Granting a TRO and Preliminary
       Injunction ......................................................................... 21

  D.   The Public Interest Strongly Favors Granting a TRO and Preliminary
       Injunction ......................................................................... 22

III. CONCLUSION .......................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AAMCO Transmissions, Inc. v. Singh*,
    2012 WL 4510928 (E.D. Pa. Oct. 1, 2012)............................................................17

*Advanced Fluid Sys., Inc. v. Huber*,
    295 F. Supp. 3d 467 (M.D. Pa. 2018) ..................................................................14

*Bimbo Bakeries USA, Inc. v. Botticella*,
    613 F.3d 102 (3d Cir. 2010).......................................................................16, 22, 23

*Campbell Soup Co. v. ConAgra, Inc.*,
    977 F.2d 86 (3d Cir. 1992)...................................................................................19

*Catalyst Outdoor Advertising, LLC v. Douglas*,
    2018 WL 2363463 (E.D. Pa. May 24, 2018) .........................................................17

*CentiMark Corp. v. Lavine*,
    2011 WL 3209106 (W.D. Pa. July 28, 2011) ..................................................20, 21

*Church v. Tentarelli*,
    953 A.2d 804 (Pa. Super. Ct. 2008).....................................................................16

*Citibank, N.A. v. Kyle*,
    2015 WL 3755788 (E.D. Pa. June 16, 2015) .........................................................17

*First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*,
    155 F. Supp. 2d 194 (M.D. Pa. 2001) ..................................................................13

*Fisher Bioservices, Inc. v. Bilcare*,
    2006 WL 1517382 (E.D. Pa. May 31, 2006) .........................................................21

*Freedom Med. Inc. v. Whitman*,
    343 F. Supp. 3d 509 (E.D. Pa. 2018) ...................................................................13

*Graphic Mgmt. Associates, Inc. v. Walter Hatt*,
    1998 WL 159035 (E.D. Pa. Mar. 18, 1998)..........................................................23

*Healthcare Servs. Grp., Inc. v. Fay*,
    597 F. App'x 102 (3d Cir. 2015) ..........................................................................20

*Hess v. Gebhard Co. & Inc.*,
    808 A.2d 912 (Pa. 2002) .....................................................................................17

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
276 F.3d 160 (3d Cir. 2001).............................................................................13

*Huntington Learning Ctrs., Inc. v. Kearns-Jones*,
2017 WL 8941227 .............................................................................................17

*Inst. for Motivational Living, Inc. v. Sylvan Learning Ctr.*,
2008 WL 379654 (W.D. Pa. Feb. 8, 2008) ...................................................22

*Int'l Soc. for Krischna Consciousness, Inc. v. Stadium Auth. of Pittsburgh*,
479 F. Supp. 792 (W.D. Pa. 1979)...................................................................19

*Jazz Pharm., Inc. v. Synchrony Grp., LLC*,
343 F. Supp. 3d 434 (E.D. Pa. 2018) ..............................................................15

*John G. Bryant Co. v. Sling Testing & Repair, Inc.*,
369 A.2d 1164 (Pa. 1977) .................................................................................20

*L.B. Foster Co. v. Barnhart*,
2014 WL 11395182 (W.D. Pa. July 30, 2014) .............................................16

*Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Servs. Inc.*,
1995 Pa. Dist.........................................................................................18, 19

*Masure v. Massa*,
692 A.2d 1119 (Pa. Super. Ct. 1996)..............................................................20

*Merrill Lynch v. Napolitano*,
85 F. Supp. 2d 491 (E.D. Pa. 2000) .................................................................21

*Nat'l Bus. Servs. v. Wright*,
2 F. Supp. 2d 701 (E.D. Pa. 1998)..............................................................21, 23

*NextGen Health Info. Sys., Inc. v. Messier*,
2005 WL 3021095 (E.D. Pa. Nov. 10, 2005) ...............................................20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*,
290 F.3d 578 (3d Cir. 2002)..............................................................................21

*Ogontz Controls Co. v. Pirkle*,
499 A.2d 593 (Pa. Super. Ct. 1985).................................................................22

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
764 F. App'x 273 (3d Cir. 2019) .....................................................................22

*Phila. Dairy Prod. v. Quaker City Ice Cream Co.,*
    159 A. 3 (Pa. 1932) ...................................................................................................19

*PNC Mortg. v. Superior Mortg. Corp.,*
    2012 WL 628000 (E.D. Pa. Feb. 27, 2012) ...............................................................14

*Prudential Insurance Company of America v. Browne,*
    2006 WL 8450239 (M.D. Pa. Jan. 12, 2006) ...........................................................16

*Quaker Chemical Corp. v. Varga,*
    509 F. Supp. 2d 469 (E.D. Pa. 2007) ..............................................................18, 23

*Reilly v. City of Harrisburg,*
    858 F.3d 173 (3d Cir. 2017) .............................................................................12, 13

*Revzip v. McDonnell,*
    2019 WL 6701835 (W.D. Pa. Dec. 9, 2019) .............................................................19

*Shepherd v. Pittsburgh Glass Works, LLC,*
    25 A.3d 1233 (Pa. Super. Ct. 2011) ..........................................................................20

*SI Handling Sys., Inc. v. Heisley,*
    753 F.2d 1244 (3d Cir. 1985) ....................................................................................23

*United States v. Bell,*
    414 F.3d 474 (3d Cir. 2005) ......................................................................................12

*Victaulic v. Tieman,*
    499 F.3d 227 (3d Cir. 2007) ......................................................................................23

**Statutes**

18 U.S.C. § 1836(b)(3)(A) ...................................................................................................15

18 U.S.C. § 1839 (3)(A)-(B) ...............................................................................................14

Pennsylvania Uniform Trade Secrets Act ....................................................................13, 16

**Rules**

Federal Rule of Civil Procedure 65 ....................................................................................12

**Other Authorities**

*Restatement (Third) of Unfair Competition* § 1, cmt (g) ..................................................19

Plaintiff North American Dental Management, LLC ("NADM" or the "Company"), by and through its undersigned counsel and in support of its Motion for Temporary Restraining Order and Preliminary Injunction, respectfully states as follows:[1]

The requested temporary restraining order ("TRO") and preliminary injunction is necessary to prevent immediate and irreparable harm to NADM's business.  NADM is a dental services organization ("DSO") dedicated to offering best-in-class dental care to every patient at every visit at more than 200 affiliated dental practices across 15 states.  As a leading DSO, the Company specializes in providing non-clinical administrative services to dental practices, supporting clinical decisions by a group of affiliated dentists who collaborate to advance patient care based on a unique data and outcome-driven approach.

Until recently, NADM's valuable doctor recruiting force was led by Defendant Michele Phillips ("Phillips"), a former Manager of Doctor Recruiting for NADM.  In that role, NADM entrusted Phillips with the Company's most important and highly confidential and proprietary business metrics and plans, including, but not limited to, its information about recruiting strategies, prospective recruiting targets of dentists, dental practices, and dental professionals, geofencing of competitors, competitive strategies, contract terms, and business development and marketing initiatives.  Given her knowledge and experience, Phillips was tasked with managing all matters for NADM's doctor recruiting efforts across the country.

In exchange for her employment, Phillips entered into an agreement, evidenced by her May 10, 2021 offer letter (the "Offer Letter Agreement"), and then a Confidential/Non-Solicitation Agreement (dated May 13, 2021) (the "Confidential/Non-Solicitation Agreement").

---

[1] The facts giving rise to NADM's claims are fully set forth in NADM's Verified Amended Complaint and its attachments.  NAMD incorporates its Verified Amended Complaint herein by reference.  (*See* Verified Amended Complaint (ECF No. 6).)

Now, in direct contravention of the Offer Letter Agreement and the Confidential/Non-Solicitation Agreement, Phillips has, among other things, breached the non-compete and non-disclosure covenants of the Offer Letter Agreement and the Confidential/Non-Solicitation Agreement by working for an undisclosed direct competitor dental service organization ("DSO") within twelve (12) months of terminating her employment with NADM, by failing to timely return her NADM laptop, which contains NADM's Confidential Information and Trade Secrets, and by currently or inevitably misappropriating, disclosing and misusing NADM's most valuable confidential information and trade secrets for her own benefit and that of her new employer. Indeed, in the days leading up to her separation from NADM, Phillips was accessing, copying, and transferring highly sensitive and confidential business information from her NADM computer and onto a removable storage device. The competitive value and advantage NADM obtained through its investment in its recruiting strategy and database will be substantially impacted if Phillips is able to put NADM's technical and non-technical trade secret information to work for NADM's competitor. Accordingly, and for the reasons detailed below, an emergency TRO and preliminary injunctive relief is necessary to prevent irreparable harm to NADM. Accordingly, for the reasons detailed below, a TRO and preliminary injunctive relief is necessary to prevent irreparable harm to NADM.

## I.       FACTUAL BACKGROUND

### A.       About NADM

NADM is headquartered in Pittsburgh, Pennsylvania, and provides non-clinical administrative services to over 200 dental practices across 15 states, including human resources, recruiting, information technology, marketing, payroll and accounting services. Verified Amended Compl., ¶¶ 2, 21.   In the 15 years since its founding, NADM has expanded its footprint of services to provide administrative support services to dental practices in 15 states. *Id*,

¶ 22.  The Company's footprint enables it to provide excellent service and rapid response to its affiliated dental practices throughout the United States.  *Id.*

Through its talented team of human resources, marketing, budgeting, and information technology professionals, NADM is able to provide a full range of non-clinical services to support dentists and dental practices. Verified Amended Compl., ¶ 23.  NADM also recruits doctors and dental professionals for its supported practices as it continues to expand the reach of the services provided by the supported practices across the country. *Id.* These professionals and practices are empowered to make clinical decisions intent on delivering best-in-class oral care while providing exceptional patient experience. *Id.* NADM today employs more than 3,000 people, including about 400 team members in non-clinical positions. *Id.* NADM's commitment to this mission of excellence in dental services has transformed it into a leading dental services organization.  *Id.*

NADM uses customized recruiting solutions to locate, engage, recruit, and onboard highly qualified doctors and dental professionals to its affiliated practices.  Verified Amended Compl., ¶ 25.  This requires NADM to have an intimate knowledge of prospective recruiting targets, market data, and competitor analytics.  *Id.* As a result, NADM invests significant resources in developing and fostering these potential recruiting targets through a dedicated group of recruiting professionals, such as Phillips.  *Id.*  NADM highly compensates these professionals and provides them with significant administrative support and business-related expense reimbursement for this purpose, which all come at great expense to NADM.  *Id.*

Moreover, because of the importance of these relationships, NADM's recruiting professionals — including Phillips — are privy to vast amounts of confidential information and trade secrets related to NADM's recruiting strategies and potential recruiting targets.  Verified

Amended Compl., ¶ 26.  Such information could be easily exploited by a competitor if the competitor were permitted to gain access to such information by hiring a recruiting leader, like Phillips, who could use NADM's confidential information and trade secrets to compete directly with NADM. *Id.*

    **B.**    **Phillips' Employment with NADM and Access to NADM Confidential Information and Trade Secrets**

On October 29, 2018, NADM hired Phillips as a Dentist Recruiter.  Verified Amended Compl., ¶ 27.  Phillips left for a brief period only to return to NADM a few months later. *Id.*  On or about May 10, 2021, NADM rehired Phillips as Brand Ambassador. *Id*, ¶ 28.  In connection with her employment, she received an increase in compensation and additional job duties and, in exchange, signed the Offer Letter Agreement as well as the Confidentiality/Non-Solicitation Agreement. *Id.*

In that role, Phillips was responsible for gaining and maintaining a deep knowledge of the dental services industry; developing, maintaining and growing NADM's recruiting relationships across the country; and targeting and recruiting dentists, dental professionals, and dental practices.  Verified Amended Compl., ¶ 29.

On or about October 1, 2022, NADM promoted Phillips to Manager of Doctor Recruiting; she held that position until she resigned from the Company effective June 7, 2023. Verified Amended Compl., ¶ 30.  Phillips' elevation to Manager of Doctor Recruiting carried with it a significant increase in her compensation package, including an annual base salary increase to $125,000 and participation in NADM's lucrative bonus program with eligibility for a target bonus of 10%.  *Id.* In addition to being highly compensated, Phillips reported directly to NADM's Senior Vice President, People, and indirectly to its Chief Executive Officer.  *Id.*

In connection with her responsibilities as Manager of Doctor Recruiting, Phillips had access to NADM's most valuable recruiting relationships and its confidential and proprietary information and trade secrets (hereinafter collectively referred to as the "Confidential Information and Trade Secrets"), which included but were not limited to:

- **Technical information,** such as information regarding dental services specifications, performance, integration capabilities, research and development objectives and data, plans, intellectual property, applications and other design, service or performance data;

- **Information about existing or prospective recruiting targets**, such as target lists, contact information, transaction data, dental practice financials, professional business methodologies, patient revenue history, pricing, and credit information;

- **Business, financial and strategic information**, such as sales and earnings information, profit margins, accounting information, financial information, pricing policies, sales compensation methodologies, margins, investment plans and budgets, forecasts, strategies, plans and prospects;

- **Organizational and operational information**, such as personnel and compensation data, information concerning utilization or capabilities/performance of personnel, logistics management techniques, methodologies and systems including CRM and methods of operation, data and facilities plans; and

- **Advertising, marketing, sales or strategy information**, such as plans, programs techniques, strategies, results and budgets, pricing and volume strategies, and market research, and training and development courses.

Verified Amended Compl., ¶ 31.

As Manager of Doctor Recruiting, Phillips was intimately familiar with NADM's business and critical to the Company's nationwide recruiting efforts. Verified Amended Compl., ¶ 32. Phillips was exposed to virtually all of NADM's recruiting targets for doctors, dental professionals and dental practices across the United States, either through the Company's direct introduction or through her regular access to NADM's recruiting database covering the 15 states in which NADM provides services to dental practices and its efforts to recruit across the United States more broadly. *Id.* Moreover, NADM trained Phillips on and exposed her to its business practices and recruiting strategies regarding the dental services and solutions NADM provides to its network of affiliated dental practices. *Id.* In sum, NADM provided Phillips with Confidential Information and Trade Secrets as required to perform her job and, in turn, Phillips contributed to the wealth of that Confidential Information and Trade Secret information over time. *Id.*

## C.     Phillips' Contractual Obligations to NADM

In connection with Phillips' rehiring as Brand Ambassador, NADM required Phillips to execute the Offer Letter Agreement to protect its Confidential Information and Trade Secrets, valuable relationships, and investment in its recruiting strategies and targets—all of which Phillips would have access to in her new role. Verified Amended Compl., ¶ 33. In exchange for her execution of the Offer Letter Agreement, Phillips received the promotion and the increased compensation package described above. *Id.*

In Section 5 of the Offer Letter Agreement, Phillips agreed she would not compete with NADM for a period of twelve (12) months following her employment with NADM as follows:

> You acknowledge that (a) you will perform services of a unique
> nature for the Company, and that your performance of such
> services to a competing business will result in irreparable harm to
> the Company (and its subsidiaries or affiliates) . . .  Accordingly,
> you will not, directly or indirectly, (i) for so long as you are
> employed by the Company (or any [sic] its subsidiaries or
> affiliates) and for a period of twelve (12) months thereafter, no

6

> matter what the reason for such termination or whether such termination is initiated by you or the Company, own (beneficially or otherwise), manage, operate, control, be employed by, participate in (as a partner, director or otherwise), or perform services for (including as a consultant or advisor) any person or entity that is engaged in (or provide financial assistance to or otherwise be engaged in any manner in the operation of) any business that provides management and operational services and related functions for dental practices, including specialty dental practices . . . .

Verified Amended Compl., ¶ 34 (quoting Ex. A § 5).

Additionally, Section 5 goes on to prohibit Phillips from soliciting certain categories of employees and clients, as follows:

> . . . (ii) for so long as you are employed by the Company (or any of its subsidiaries or affiliates) and for a period of twelve (12) months thereafter, no matter what the reason for such termination or whether such termination is initiated by you or the Company, (A) solicit, induce or attempt to induce any employee or individual retained as an independent contractor of the Company (or any [sic] its subsidiaries or affiliates) to terminate his or her employment or contracting relationship with such entity, or to become an employee or independent contractor of any other person or entity, (B) solicit, induce or attempt to induce any customer, payor, supplier or other business relation of the Company (or any [sic] its subsidiaries or affiliates) to cease doing business with such entity or materially and adversely interfere with the relationship between any such customer, payor, supplier or other business relation and such entity, or (C) solicit, induce or attempt to induce any customer, payor, supplier or other business relation of the Company (or any [sic] its subsidiaries or affiliates) to conduct with anyone else any business or activity that such business relation could conduct with the Company (or any [sic] its subsidiaries or affiliates).

*Id.* ¶ 35.

Also in the Offer Letter Agreement, Phillips acknowledged and agreed "not to, during [her] employment or thereafter, disclose to any person or entity or use for [her] own account or for the account of any person or entity (other than the Company (or its subsidiaries and affiliates) any confidential information for the company without the prior written consent of the company,

unless and to the extent that such disclosure is required by law." Verified Amended Compl., ¶ 36 (quoting Ex. A § 7).

In the Confidentiality/Non-Solicitation Agreement, Phillips agreed that she would have "extensive access to and become familiar with, and may develop or contribute to, the Confidential Information" and recognized that "the Confidential Information provides the Company with a competitive advantage over others in the marketplace and is vital to the success of the Company." Verified Amended Compl., ¶ 37 (quoting Ex. B at 1). Phillips further agreed that "the Company would be irreparably injured and the good will of the Company would be irreparably damaged if [she] neglected to follow the guidelines outlined within this Agreement" and she also agreed that "the activities discussed in [the] Agreement are reasonable in scope and duration and do not unreasonably restrict [her] association with other business entities . . ." *Id*., ¶ 38.

**D.    Phillips Resigns from NADM and Immediately Breaches her Legal Obligations to The Company**

On or about May 25, 2023, Phillips informed NADM that she was resigning from the Company and that she wanted her resignation to take effect June 9, 2023. Verified Amended Compl., ¶ 40. Despite admittedly going to work for a competing DSO, Phillips failed to immediately return her Company-issued laptop computer on her last day, which contained NADM's Confidential Information and Trade Secrets. *Id*., ¶ 41. In fact, Phillips remained in possession of her laptop for approximately two weeks after her last day. *Id*. The following are just some examples of the types of documents that Phillips used or had access to leading up to her resignation and that would be maintained on her laptop:

- A proprietary digital recruitment marketing strategy built by NADM, including information such as leveraging recruitment artificial intelligence technologies, geofencing and geotargeting, bulk text messaging, and drip campaigns;

- 2023 People Strategy Presentation;

- 2023 HR strategy and PowerPoint presentation;

- HR People Strategy with information on retention, rewards, elevation, analytics, and acquisitions;

- Practice Hours Expansion Workplan regarding how to execute on hours expansion;

- Illinois Recruiting Strategy;

- Recruitment Strategy Slides;

- Doctor Recruiting strategy slides;

*Id.*

NADM learned almost simultaneously with Phillips' resignation that she started working for an undisclosed DSO directly competing with NADM. Verified Amended Compl., ¶ 42.  In other words, armed with NADM's Confidential Information and Trade Secrets, Phillips is now working for a competing DSO in direct violation of her non-compete promises to NADM.  *Id.* The violations are ongoing and it is inevitable that Phillips will misappropriate NADM's Confidential Information and Trade Secrets (if she hasn't already) if Phillips is permitted to work for a competing DSO.

**E.    Phillips Does Not Respond to NADM's Letters Regarding Phillips' Obligations to NADM**

On May 31, 2023, NADM, through counsel, sent a letter to Phillips demanding that she honor her obligations to NADM, immediately cease and desist her employment with any competing DSO, and immediately identify and return any of NADM's Confidential Information

and Trade Secrets in Phillips' possession, including her company-issued laptop. Verified Amended Compl., ¶ 43. Phillips never responded to this letter. *Id.*

On June 9, 2023, NADM, again through counsel, sent a letter to Phillips making clear that NADM would not accept her silence and reiterating that it intended to enforce Phillips' contractual obligations. Verified Amended Compl., ¶ 44. Phillips never responded to this letter. *Id.*

Despite these requests, Phillips waited approximately two weeks to return her company-issued laptop and/or still has not confirmed that she is not in possession of NADM's Confidential Information and Trade Secrets. Verified Amended Compl., ¶ 45. Phillips has failed to meaningfully respond to any of NADM's above-referenced demands, including providing reassurances to confirm that Phillips did not use, copy or disclose NADM's Confidential Information and Trade Secrets. *Id.*, ¶ 46.

As NADM soon additionally discovered, Phillips had not left empty-handed. Verified Amended Compl., ¶ 47. After Phillips belatedly returned her NADM-issued laptop computer, NADM had it forensically examined. *Id.* The data immediately and unequivocally showed that, in the days prior to her resignation, Phillips connected a personal USB Mass Storage Device to her NADM laptop and copied and saved to that USB drive NADM most important confidential and trade secret information related to its recruiting strategy, targets, compensation information, offer letter details, complete files on NADM recruiting targets and recruiting presentations. *Id.* Those 400-plus files included, among others, 2023\Dentist Recruiting logins 2023.xlsx, 2023\1 How to and contacts.docx, 2023\All Dentist Candidate Details and to send to a GD or Specialist, 2023\All Dentist Salary Details, 2023\Dental School Presentation, 2023\New Hire Onboarding, 2023\Recruitment Strategy – regional, 2023\Recruitment Alignment, 2023\Sourcing, 2023\All

Forms and Dr. Recruitment Processes, 2020\IT Reports - Active Starts and Recinds, 2020\Doc Compensation, 2020\Candidate Files Folder, 2023\2022 - Recruiting Data, 2023\Offer Details Hires and Declines, and 2023\Recruiting Bonuses, 2023\Sourcing reports.  *Id*.

Phillips' misappropriation fundamentally violates the trust NADM placed in her as its Manager of Doctor Recruiting, as well as her contractual, statutory, and common law duties and obligations to NADM.  Verified Amended Compl., ¶ 48.  Phillips' deceptive behavior regarding her new employer, her downloading of NADM's highly confidential and trade secret files to a personal USB drive prior to leaving, her employment with a competing DSO, her repeated failure to respond to requests for confirmation that she was not in possession of NADM's property and was complying with her post-employment obligations to NADM and her acts in dodging service of NADM's original complaint show premeditated — if not concerted — intent to steal and use NADM's Confidential Information and Trade Secrets on behalf of herself and her unidentified new employer.  *Id*.  Moreover, now armed with NADM's stolen property, Phillips is actively and directly competing with NADM in direct violation of her post-employment obligations to NADM. Phillips will continue to use NADM's Confidential Information and Trade Secrets (including those she stole) and its considerable goodwill for the benefit of herself and her unidentified new employer, thereby unfairly competing with NADM. *Id*.

**F.    NADM Protects Its Confidential Information and Trade Secrets**

NADM goes to great lengths to protect its investment in its Confidential Information and Trade Secrets.  Verified Amended Compl., ¶ 50.  NADM has taken various steps to protect its Confidential Information and Trade Secrets, including: (a) using network firewalls, password protection, and security credentials to prevent unauthorized access to NADM's servers; (b) limiting its employees' access to information to that which is necessary to fulfill their job

functions; (c) controlling physical access to NADM's offices, facilities and information; (d) requiring employees with access to its trade secrets to sign restrictive covenants, including restrictive covenant agreements; (e) implementing and enforcing policies and procedures to protect its Confidential Information and Trade Secrets; and (f) enforcing its employees' obligations with respect to its trade secrets. *Id.*   In addition, all NADM employees are subject to employee policies, such as NADM's Team Member Handbook, which requires them to maintain and keep confidential NADM's Confidential Information and Trade Secrets. *Id.* ¶ 52.

## II.   THE COURT SHOULD GRANT A TRO AND PRELIMINARY INJUNCTION AGAINST PHILLIPS AND ENJOIN HER FROM WORKING FOR NADM'S DIRECT COMPETITOR AND FROM MISAPPROPRIATING ITS CONFIDENTIAL INFORMATION AND TRADE SECRETS

Pursuant to Federal Rule of Civil Procedure 65, NADM seeks immediate relief in the form of a TRO/preliminary injunction against Phillips to (a) require the return of NADM's Confidential Information and Trade Secrets; (b) enjoin Phillips from misusing or disclosing NADM's Confidential Information and Trade Secrets; and (c) enjoin Phillips from working for a competitor for twelve (12) months in accordance with the Offer Letter Agreement.  As set forth above, NADM can establish all of the elements necessary for a TRO/preliminary injunction, and the relief is necessary to prevent the immediate irreparable harm to NADM.

Rule 65 allows a district court to enter a temporary restraining order. The Court of Appeals for the Third Circuit has applied one standard to a motion for both a TRO and a preliminary injunction. *United States v. Bell*, 414 F.3d 474 (3d Cir. 2005).  A TRO and/or injunctive relief is warranted when the party seeking a TRO and/or injunction establishes: (1) a "reasonable probability of success" on the merits, and (2) "that it will be irreparably injured" without injunctive relief.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (cleaned up).  If those two factors are met, then the court should consider "(3) the possibility of harm to

other interested person from the grant or denial of the injunction, and (4) the public interest." *Id.* (cleaned up).

### A.    NADM Will Prevail on the Merits

NADM is likely to succeed on the merits of this case because it has valid and enforceable agreements with Phillips, it has legitimate business interests to protect, and Phillips's breaches of her contractual obligations to NADM are open, blatant, and obvious. At this stage, NADM need only "prove a prima facie case, not a certainty that [it] will win." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). This "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179. Importantly, this showing need only be met for one claim. *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 234 (M.D. Pa. 2001).

### 1.    *NADM Will Succeed on its Claims under the Defend Trade Secrets Act and Pennsylvania Uniform Trade Secrets Act*[2]

Phillips has improperly and without authorization misappropriated, retained, used, disclosed, and/or exploited NADM's Confidential Information and Trade Secrets in violation of the Defend Trade Secrets Act of 2016 ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA").

Under the DTSA, the term "trade secret" encompasses:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patters, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if-- (A) the owner thereof has taken

---

[2] Although NADM has brought claims under the DTSA and PUTSA, "the analysis as to the likelihood of success is the same because the DTSA and PUTSA effectively proscribe the same conduct." *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 518 n.6 (E.D. Pa. 2018).

> reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839 (3)(A)-(B).

Under the DTSA, "misappropriation" means the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." *Id.* § 1839(5). It also encompasses:

…disclosure or use of a trade secret of another without express or implied consent by a person who--

> (i)   used improper means to acquire knowledge of the trade secret;
>
> (ii)  at the time of the disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
>
>> (I)   acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>>
>> (II)  derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; . . . .

*Id.* "Improper means" include "theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 1839(6).

Liability for misappropriation of trade secrets extends not only to the individuals directly engaging in such conduct, but also to their employer who knew or should have known about the misappropriation. *PNC Mortg. v. Superior Mortg. Corp.*, 2012 WL 628000, at *30 (E.D. Pa. Feb. 27, 2012). An employer may also be held vicariously liable for misappropriation. *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 486 (M.D. Pa. 2018). The DTSA also

empowers a court to enjoin either actual or threatened misappropriation. *Jazz Pharm., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434 (E.D. Pa. 2018) (citing 18 U.S.C. § 1836(b)(3)(A)).

In light of these factors, the evidence will establish that NADM's Confidential Information and Trade Secrets are trade secrets under the DTSA. Throughout Phillips's employment, she had access to NADM's Confidential Information and Trade Secrets, including, but not limited to: (1) information concerning past, present, and prospective targets for recruitment of doctors, dental professionals and dental practices; (2) information relating to dental services specifications, performance, integration capabilities, research and development objectives, data, plans and intellectual property; (3) financial information, pricing policies, sales compensation methodologies, margins, investment plans and budgets, forecasts, strategies, plans and prospects; (4) personnel and compensation data, information concerning utilization or capabilities/performance of personnel, logistics management techniques, methodologies and systems including CRM and methods of operation, data and facilities plans; and (5) marketing plans, programs techniques, strategies, results and budgets, pricing and volume strategies, and market research, and training and development courses.

As described above, NADM took the steps necessary to protect its Confidential Information and Trade Secrets. Here, NADM's Confidential Information and Trade Secrets were kept in the strictest confidence and were unknown outside the organization. Furthermore, competition for the recruitment of doctors, dental professionals and dental practices is significant, and NADM's competitors, would find substantial value in having access to a former NADM Director of Doctor Recruiting armed with some of NADM's most crucial Confidential Information and Trade Secrets.

Phillips is in possession of NADM's Confidential Information and Trade Secrets, including, without limitation, contact information for NADM's recruiting targets, as well as NADM's recruiting strategies.  In addition, given the Confidential Information and Trade Secrets to which Phillips was privy during her employment with NADM, Phillips cannot work for a competitor of NADM without inevitably calling upon or using NADM's Confidential Information and Trade Secrets.   Phillips possession and/or use of NADM's Confidential Information and Trade Secrets clearly demonstrates misappropriation under the DTSA.  *See, e.g., L.B. Foster Co. v. Barnhart*, 2014 WL 11395182, at *2 (W.D. Pa. July 30, 2014) (finding the defendant misappropriated trade secrets by emailing files to his personal email account after accepting competitor's offer of employment); *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 118 (3d Cir. 2010) (affirming district court's ruling that the defendant intended to misappropriate trade secrets given his receipt of such information after committing to a new job with a competitor and copying of information from his work laptop onto a USB device). Accordingly, NADM has shown a reasonable probability of success on its DTSA and PUTSA claims against Phillips.

### 2.    *NADM Will Succeed on Its Breach of Contract Claim Against Phillips*

To establish a breach of contract under Pennsylvania law,[3] the plaintiff must show: "(1) the existence of a contract, including its essential terms; (2) the breach of a duty imposed by the contract; and (3) damages."  *Church v. Tentarelli*, 953 A.2d 804, 808 (Pa. Super. Ct. 2008). Under Pennsylvania law, restrictive covenants are enforceable if they are ancillary to an employment relationship, supported by adequate consideration, reasonable in scope and duration and necessary to protect a legitimate business interest of a former employer.  *See Prudential*

---

[3] The Offer Letter Agreement contains a choice of law provision stating that it will be governed by Pennsylvania law.  (*See* Ex. A § 8.)

*Insurance Company of America v. Browne*, 2006 WL 8450239, at *4 (M.D. Pa. Jan. 12, 2006); *Hess v. Gebhard Co. & Inc.*, 808 A.2d 912, 917 (Pa. 2002).

Here, the Offer Letter Agreement and Confidentiality/Non-Solicitation Agreement were ancillary to the employment relationship between NADM and Phillips and supported by adequate consideration in the form of rehiring her, increased compensation and additional job duties. Additionally, Phillips acknowledged in her Offer Letter Agreement that, in furtherance of her duties for NADM, she would receive and have access to certain confidential information and trade secrets. (Ex. A § 5.) Phillips also had access to and used NADM's Confidential Information and Trade Secrets in the performance of her duties as Brand Ambassador and in her most recent role as Manager of Doctor Recruiting, as described in detail above. NADM also provided Phillips with significant and valuable training and instruction to allow her to perform her role as a Manager of Doctor Recruiting. Accordingly, NADM has a legitimate interest in protecting its Confidential Information and Trade Secrets and goodwill by enforcing the terms of the Agreements. *See, e.g.*, *Citibank, N.A. v. Kyle*, 2015 WL 3755788, at *10-11 (E.D. Pa. June 16, 2015).

The Offer Letter Agreement is also reasonably limited in time. Courts routinely uphold restrictive covenants in excess of one year as reasonable, and the Offer Letter Agreement provides for only a twelve (12) month restriction. *See, e.g., Huntington Learning Ctrs., Inc. v. Kearns-Jones*, 2017 WL 8941227, at *9 (W.D. Pa. Nov. 7, 2017 (citing *AAMCO Transmissions, Inc. v. Singh*, 2012 WL 4510928, at *2 (E.D. Pa. Oct. 1, 2012)) (holding two-year non-compete covenant reasonable); *Catalyst Outdoor Advertising, LLC v. Douglas*, 2018 WL 2363463, at *3 (E.D. Pa. May 24, 2018) (noting that "[a] two year limitation for restrictive covenants is generally upheld by Pennsylvania courts").

The geographic scope likewise is reasonable. Phillips acknowledged as much in the Offer Letter Agreement. (Ex. A § 5.) Given the geographic breadth of NADM's business operations and Phillips's role in recruiting targets for doctors, dental professionals and dental practices across the United States, an equally broad restrictive covenant is reasonable and necessary to adequately protect NADM's legitimate business interests. *See, e.g., Quaker Chemical Corp. v. Varga*, 509 F. Supp. 2d 469, 476 (E.D. Pa. 2007) ("Courts have upheld non-compete covenants lacking geographic limits (or with very broad geographic restrictions) where the employee's duties and the employer's customers were geographically broad."). Thus, the restrictive covenant in the Offer Letter Agreement is enforceable.

Finally, Phillips cannot reasonably dispute that she is in violation of the Offer Letter Agreement and the Confidential/Non-Solicitation Agreement because she (a) retained NADM's Confidential Information and Trade Secrets (including the contact information of NADM's recruiting targets in her phone); (b) disclosed NADM's Confidential Information and Trade Secrets to her new DSO employer and/or used NADM's Confidential Information and Trade Secrets on behalf of her new DSO employer; (c) accepted employment with and is currently working for a competing DSO, thereby actively and directly competing with NADM; and (d) failed to return NADM's property, including without limitation NADM's Confidential Information and Trade Secrets. As a proximate result of Phillips' actions, NADM has suffered and will continue to suffer harm which cannot be adequately compensated by monetary damages alone. Accordingly, NADM has established a reasonable likelihood of success on its breach of contract claim against Phillips.

### 3.    *NADM Will Succeed on Its Unfair Competition Claim*

Unfair competition means "conduct which is contrary to honest, industrial and commercial practices." *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance &*

*Med. Servs. Inc.*, 1995 Pa. Dist. & Cnty. Dec., 1995 WL 842000, at *1 (Pa. Com. Pl. Oct. 18, 1995) (citing *Int'l Soc. for Krischna Consciousness, Inc. v. Stadium Auth. of Pittsburgh*, 479 F. Supp. 792 (W.D. Pa. 1979)).   If an employee (1) breaches her employment contract and improperly begins to compete with her former employer or (2) improperly uses her former employer's confidential and proprietary information in competition with her former employer, the employee is liable for unfair competition.   *See Phila. Dairy Prod. v. Quaker City Ice Cream Co.*, 159 A. 3, 5 (Pa. 1932); *Lakeview Ambulance*, 1995 WL 842000, at *1 (citing *Restatement (Third) of Unfair Competition* § 1, cmt (g)).

As set forth above, Phillips has committed various wrongful acts including, but not limited to, misappropriating NADM's Confidential Information and Trade Secrets and violating her Offer Letter Agreement and the Confidentiality/Non-Solicitation Agreement.   This conduct supports a finding of liability against Phillips for unfair competition.   Thus, the Court should enjoin Phillips from continuing to unfairly compete against NADM.

### B.    NADM Is Suffering and Will Continue to Suffer Immediate and Irreparable Harm Absent a TRO and Injunctive Relief

In the Offer Letter Agreement, Phillips explicitly acknowledged that she "will perform services of a unique nature for [NADM], and that [her] performance of such services to a competing business will result in irreparable harm to [NADM] (and its subsidiaries or affiliates)…"  (Ex. A § 5.)

Moreover, the Third Circuit has recognized that "an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992).  Indeed, "[t]he use or disclosure of a trade secret almost always constitutes irreparable harm for purposes of issuing an injunction." *Revzip v. McDonnell*, 2019 WL 6701835, at *8

(W.D. Pa. Dec. 9, 2019); *see also NextGen Health Info. Sys., Inc. v. Messier*, 2005 WL 3021095, at *13 (E.D. Pa. Nov. 10, 2005) (explaining that the use of an employer's confidential and trade secret information to damage its competitive advantage is well recognized as causing irreparable harm).

Likewise, "'the threat of the unbridled continuation of the violation [of a restrictive covenant] and the resultant incalculable damage to the former employer's business establishes irreparable harm.'" *Healthcare Servs. Grp., Inc. v. Fay*, 597 F. App'x 102, 104 (3d Cir. 2015) (quoting *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 369 A.2d 1164, 1167 (Pa. 1977)). That is because the loss of assets like future business opportunities, client goodwill, and an employer's reputation, along with the loss sustained by the misuse of confidential information, is difficult, if not impossible, to quantify. *See, e.g., Masure v. Massa*, 692 A.2d 1119, 1122 (Pa. Super. 1996) (holding that the plaintiff "suffered irreparable injury as the number of lost customers cannot be accurately calculated."); *Shepherd v. Pittsburgh Glass Works, LLC*, 25 A.3d 1233 (Pa. Super. 2011) (noting that Pennsylvania courts will grant injunctive relief to protect an employers' trade secrets under appropriate circumstances); *CentiMark Corp. v. Lavine*, 2011 WL 3209106, at *4 (W.D. Pa., July 28, 2011) (explaining that "[d]amage to customer relationships has been held to constitute irreparable harm").

Because NADM has established that it is likely to succeed on, at a minimum, its trade secret and breach of contract claims, it also has established irreparable harm. Indeed, if the Court does not issue a TRO and preliminary injunction, the risk of irreparable harm to NADM will only increase. The Court must put a stop to this now by issuing a TRO and preliminary injunction enjoining Phillips from continuing to misappropriate NADM's Confidential

Information and Trade Secrets for the benefit of her new employer and Phillips and hold Phillips to her post-employment obligations.

### C.    The Balance of Equities Strongly Favors Granting a TRO and Preliminary Injunction

Before granting a TRO and preliminary injunction, the court must balance "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*, 290 F.3d 578, 596 (3d Cir. 2002).  When a plaintiff seeks to enjoin a former employee to prevent the use or disclosure of confidential information, the balance of hardships almost always weighs in the employer's favor.  *See Fisher Bioservices, Inc. v. Bilcare*, 2006 WL 1517382, at *21 (E.D. Pa., May 31, 2006) (enforcing agreement that precluded employee from using confidential information and soliciting business opportunities from customers); *Nat'l Bus. Servs. v. Wright*, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (finding balance of harms weighed in favor of employer because defendant would still be able to earn a livelihood).

Conversely, where, as here, an employee like Phillips breaches enforceable restrictive covenants by competing against her former employer and using her former employer's Confidential Information and Trade Secrets and goodwill, "'the harm to the employer trumps the harm to the employee.'" *CentiMark*, 2011 WL 3209106, at *5 (quoting *Fisher, 2006 WL 1517382*, at *12).  Indeed, "[t]he self-inflicted nature of any harm suffered by the wrongdoer [the employee] weighs heavily in favor of granting preliminary injunctive relief." *Merrill Lynch v. Napolitano*, 85 F. Supp. 2d 491, 498-99 (E.D. Pa. 2000).

NADM has spent significant time and money developing its Confidential Information and Trade Secrets.  Through her work for NADM's direct competitor, Phillips is using that information to the detriment of NADM and to unfairly benefit her new employer.  Without a

TRO and injunctive relief, Phillips will continue to misuse the Confidential Information and Trade Secrets entrusted to her by NADM for her own gain and the benefit of her new employer, a direct competitor of NADM. *See Ogontz Controls Co. v. Pirkle*, 499 A.2d 593, 597 (Pa. Super. 1985) (finding that harm was not just likely, but a "certainty," where an employee was engaged in unfair competition with his former employer). Already, Phillips' clear aim has been to compete with NADM and continue to possess NADM's Confidential Information and Trade Secrets continuing to the present.

The harm that NADM will continue to suffer far outweighs any harm that Phillips may experience by being held to her statutory obligations not to misappropriate NADM's Confidential Information and Trade Secrets and being held to her post-employment obligations to NADM. Phillips will not be prevented from working. She simply will be prohibited from competing directly with NADM and using NADM's Confidential Information and Trade Secrets, which she has no right to use for the benefit of anyone but NADM.

### D.    The Public Interest Strongly Favors Granting a TRO and Preliminary Injunction

"[I]f a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Inst. for Motivational Living, Inc. v. Sylvan Learning Ctr.*, 2008 WL 379654, at *5 (W.D. Pa., Feb. 8, 2008). That is the case here.

"[T]he public has a clear interest in ensuring fair business practices and safeguarding trade secrets." *Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 280 (3d Cir. 2019). That strong public interest is served by upholding "the inviolability of trade secrets[.]" *Bimbo Bakeries*, 613 F.3d at 119 (cleaned up). Accordingly, in trade secret cases like this, it is "not necessary for the district court to engage in extended analysis of the public interest – extensive

precedent supports an injunctive remedy where" - as here - "the elements of a trade secret claim are established." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1265 (3d Cir. 1985); *see also Bimbo Bakeries*, 613 F.3d at 119. Instead, a TRO and preliminary injunctive relief is clearly necessary to protect the holder of the trade secret and uphold the public interest, and it "will discourage unfair competition" and "the misappropriation and wrongful use of confidential information and trade secrets[.]" *Wright*, 2 F. Supp. 2d at 709.

Likewise, "restrictive covenants serve an important business interest in today's economy." *Varga*, 509 F. Supp. 2d at 481. They "have developed into important business tools to allow employers to prevent their employees and agents from learning their trade secrets, befriending their customers and then moving into competition with them." *Victaulic v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007). The public interest is thus served by enforcing such important business tools. *Wright*, 2 F. Supp. 2d at 709.

The impact that Phillips' defiance will have on other NADM employees with similar restrictive covenants in their employment contracts is also incalculable. "Restrictive covenants only have value if they are enforced." *Graphic Mgmt. Associates, Inc. v. Walter Hatt*, 1998 WL 159035, at *18 (E.D. Pa., Mar. 18, 1998). Thus, "allowing [a former employee] to freely violate [her] restrictive covenant . . . would encourage [NADM's] other employees to violate their restrictive covenants." *Id.* In effect, "then the sanctity of the covenants [NADM] has with other employees will be greatly diminished and [its] ability to enforce these covenants will be curtailed." *Id.*

## III.     CONCLUSION

For the foregoing reasons, the Court should grant NADM's Motion for Temporary Restraining Order and Preliminary Injunction.

Dated:  July 9, 2023                              Respectfully submitted,

                                        BUCHANAN INGERSOLL & ROONEY PC

                                        By: /s/ *Erin J. McLaughlin*
                                        Erin J. McLaughlin (PA 202044)
                                        erin.mclaughlin@bipc.com
                                        Christian C. Antkowiak (PA 209231)
                                        Christian.antkowiak@bipc.com
                                        Nicholas J. Bell (PA 307782)
                                        nicholas.bell@bipc.com
                                        Union Trust Building
                                        501 Grant Street, Suite 200
                                        Pittsburgh, PA 15219-1410
                                        Phone:        (412) 562-8800
                                        Facsimile:    (412) 562-1041


                                        *Attorneys for Plaintiff*

4865-2478-8845, v. 3

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served via email on the 9th day of July 2023 and attempted to be served via personal service on the 10th day of July, 2023, to the following:

Michele Phillips
6573 Pocklington Road
Britton, MI  49229

*/s/ Erin J. McLaughlin*